## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ARCHBISHOP E. BERNARD JORDAN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LARRY D. REID, individually and d/b/a "LARRY REID LIVE"; JUSTIN D. EDWARDS; CALVIN R. BLAKE, SR.; DAVYON AUGUSTUS, individually and d/b/a "CONSCIOUS TV"; and d/b/a "MAD CHURCH DISEASE"; TYESSE JACKSON, individually and d/b/a "THE TYESSE REPORT"; JAMES SINGLETARY; KENDALL PEACOCK; CHAMACO BRYANT; and JOHN/JANE DOES 1-10,**<br><br>**Defendants.** | **Civil Action No.: _____**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Archbishop E. Bernard Jordan ("Plaintiff" or "Archbishop Jordan"), by and through his attorneys, Nesenoff & Miltenberg, LLP, as and for his Complaint against Larry Reid ("Dr. Reid"), Pastor Justin D. Edwards ("Pastor Edwards"), Calvin R. Blake ("Blake"), Defendant Davyon Augustus, individually and d/b/a "Consciouz Tv"; Marcellus McMillian, Individually and d/b/a "Mad Church Disease"; Tyesse Jackson, Individually and d/b/a "The Tyesse Report" James Singletary; Kendall Peacock; Chamaco Bryant; and John/Jane Does 1-10 (collectively, "Defendants"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.    This action arises from Defendants' orchestrated campaign of unlawful surveillance, nonconsensual recording, and intentional dissemination of recordings of Archbishop Jordan, followed by the publication and monetization of false, defamatory, and highly invasive statements concerning Plaintiff's private life.

2.      Plaintiff is a nationally recognized minister with more than four decades of pastoral leadership, public teaching, and media presence. His credibility, moral authority, and reputation are foundational to his vocation, ministerial standing, and the trust placed in him by faith-based communities nationwide.

3.      Defendants Larry Reid, Pastor Justin Edwards, and Calvin Blake engaged in the deliberate nonconsensual disclosure, commercialization, and amplification of Plaintiff's private sexual information across multiple digital platforms, including behind paywalls, for financial gain and notoriety. This coordinated conduct caused profound reputational destruction, severe emotional distress, and significant harm to Archbishop Jordan's ministry and professional relationships.

4.      The misconduct at issue includes, but is not limited to, the unauthorized recording and public disclosure of private facts, defamation *per se*, civil conspiracy, and revenge-porn adjacent activity, all carried out with knowledge of Plaintiff's identity, standing, and vulnerability to reputational injury.

5.      Plaintiff's professional and pastoral life depends upon integrity, confidentiality, and the sanctity of pastoral communications and mentorship relationships. Defendants' conduct directly undermined these core principles, inflicting lasting harm that cannot be remedied absent judicial intervention.

## THE PARTIES

6.      Plaintiff Archbishop Jordan is a nationally known religious leader, author, and clergy figure with a decades-long public ministry.

7.      Plaintiff is a resident of the State of New York.

8.      At all times relevant to this Complaint, Defendant Larry Reid was and is a media personality who operates the online platform "Larry Reid Live." Upon information and belief, Dr. Reid resides in the State of Georgia.

9.      At all times relevant to this Complaint, Defendant Pastor Justin D. Edwards served as Senior Pastor of the Holy Cross Baptist Church South in Chicago, Illinois. Upon information and belief, Pastor Edwards resides in the State of Illinois.

10.      At all times relevant to this Complaint, Defendant Calvin R. Blake, Sr. was an individual initially hired as a driver for Plaintiff in connection with a speaking engagement at a church in Houston, Texas, and who thereafter maintained contact with Plaintiff. Upon information and belief, Defendant Blake resides in Houston, Texas.

11.      At all times relevant to this Complaint, Defendant Davyon Augustus was an individual who operates a YouTube channel called "Consciouz TV." Upon information and belief Defendant Augustus resides in Columbia, South Carolina and operates his media business, Consciouz TV, out of Columbia, South Carolina.

12.      At all times relevant to this Complaint, Defendant Marcellus McMillian was an individual who operates the YouTube channel "Mad Church Disease." Upon information and belief, Defendant McMillian resides in California and operates his media business, Mad Church Disease, out of California.

13.      At all times relevant to this Complaint, Defendant Tyesse Jackson was an individual who operates the YouTube channel "The Tyesse Report." Upon information and belief, Defendant Jackson resides in the State of Georgia and operates his media business, The Tyesse Report, out of Georgia.

14.    Defendant James Singletary is an individual who appeared as a guest and made defamatory public statements regarding Plaintiff that were broadcast and republished by co-Defendants. Upon information and belief, Defendant Singletary resides in the State of Georgia.

15.    At all times relevant to this Complaint, Defendant Kendall Peacock was an individual who edited and altered illegally obtained audio recordings involving Plaintiff and distributed such altered recordings to online bloggers and media personalities. Upon information and belief, Defendant Peacock resides in the State of Georgia.

16.    At all times relevant to this Complaint, Defendant Chamaco Bryant was an individual who was present during playback sessions of illegally obtained recordings and participated in private discussions furthering the conspiracy against Plaintiff. Upon information and belief, Defendant Bryant resides in the State of Georgia.

17.    Defendants John/Jane Does 1-10 are individuals whose identities are presently unknown who assisted, facilitated, leaked, or republished illegal recordings or defamatory content concerning Plaintiff. Plaintiff will seek leave to amend this Complaint upon discovery of their identities.

## JURISDICTION AND VENUE

18.    The District Court for the Southern District of New York has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests.

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff's claims arise under the Federal Wiretap Act, 18 U.S.C. § 2510 et seq. and the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

21.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacts business within this District; (b) has committed tortious acts within this District; (c) has committed tortious acts outside this District causing injury within this District; and/or (d) has directed defamatory publications at residents of this District through internet platforms accessible in this District.

22.     At all relevant times, the actions and events discussed herein transpired within the State of New York.

23.     Venue for this action properly lies in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## STATEMENT OF FACTS

### I.    Background

24.     Plaintiff Archbishop Jordan is a nationally recognized minister with more than four decades of pastoral leadership, public teaching, and media presence. His reputation for integrity, discretion, and moral authority is central to his vocation, ministerial standing, and the trust placed in him by faith-based communities nationwide.

25.     Throughout his ministry, Plaintiff has adhered to strict ethical standards governing pastoral counseling, mentorship, and confidentiality. His professional and pastoral relationships depend upon credibility, discretion, and the sanctity of private communications.

26.     Over the course of his ministry, Plaintiff maintained a consistent record of ethical leadership and pastoral responsibility and did not engage in any inappropriate sexual conduct.

27.     Plaintiff and Defendant Edwards had a close personal relationship; however, it did not involve coercion, compensation, or any exchange of value.

28.     When it became apparent that Edwards' motivations were financial and inconsistent with Plaintiff's values and boundaries, Plaintiff ceased communication.

29.     At no time did Plaintiff compensate Edwards for intimacy or engage in prostitution, solicitation, or any form of transactional sexual conduct. Any financial assistance Plaintiff provided was charitable and pastoral in nature.

30.     Edwards gained access to Plaintiff through positions of trust and proximity created by Plaintiff's ministerial role.

31.     In furtherance of pastoral support, Plaintiff provided limited financial assistance to Edwards and his spouse, including covering a vehicle payment when they lacked reliable transportation necessary for ministry work. Plaintiff also retained and paid for legal counsel for Edwards' son when he became involved in a legal matter. These actions were undertaken philanthropically and as an extension of pastoral care.

32.     After Edwards revealed his true intentions, Plaintiff discontinued and terminated all such assistance.

33.     Consistent with his longstanding ministry practice, Plaintiff routinely provided mentorship, guidance, and charitable support to individuals engaged in faith-based or ministerial work. Such support was offered as an act of pastoral care and philanthropy, not as part of any quid pro quo arrangement.

34.     After Plaintiff terminated the relationship, Edwards, acting in concert with Defendants Reid and Blake and others, engaged in conduct designed to retaliate against Plaintiff, extract financial benefit, and damage Plaintiff's reputation.

35.     Defendants' subsequent actions included the secret recording of private communications, the dissemination of those recordings, and the publication of distorted or false narratives concerning Plaintiff's private life.

36.     Defendants undertook this conduct with knowledge of Plaintiff's identity, vocation, and the severe and foreseeable harm such disclosures would inflict upon his reputation and ministry.

37.     At all relevant times, Plaintiff had a reasonable expectation of privacy in his communications, relationships, and pastoral interactions. Defendants knowingly violated that expectation.

38.     Defendants coordinated with one another and with third parties to amplify these disclosures across multiple media platforms, including subscription-based and paywalled services, converting Plaintiff's private life into content for profit and leverage.

39.     As a direct and proximate result of Defendants' willful and malicious conduct, Plaintiff has suffered substantial reputational harm, emotional distress, professional injury, and disruption to longstanding ministerial relationships.

### a.     *Conflict with Defendant Reid*

40.     Reid was formerly a mentee of Plaintiff for approximately four to five years. During this relationship, Reid has publicly acknowledged paying approximately $3 million in contributions to Plaintiff's ministry.

7

41.    The conflict involving Defendant Reid originated in October 2024 during the United States election season, when Reid stated publicly that Archbishop Jordan supported a specific political candidate.

42.    The assertion was false and made without evidence. Throughout his ministry, Archbishop Jordan was careful not to publicly endorse any political candidates because his parishioners represent both democratic and republican beliefs.

43.    This rift marked the first significant public shift in the relationship between Plaintiff and Defendant Reid.

44.    Defendant Reid was formerly a mentee of Plaintiff and held himself out as a devoted follower, confidant, and beneficiary of Plaintiff's pastoral guidance. Plaintiff extended mentorship, access, and spiritual counsel to Reid in reliance on that relationship of trust.

45.    Defendant Reid cultivated a close relationship with Plaintiff over a period of years, positioning himself as a trusted mentee and insider. Plaintiff relied upon that representation in extending access, guidance, and support.

46.    Upon information and belief, Reid publicly acknowledged that he made financial contributions and offerings to Plaintiff's ministry over the course of their relationship. Such contributions were consistent with Plaintiff's longstanding ministry practices and were not personal payments to Plaintiff.

47.    Upon information and belief, Reid's relationship with Plaintiff deteriorated after Plaintiff declined to meet Reid's escalating financial expectations and demands, which were inconsistent with Plaintiff's values, ministry practices, and fiduciary responsibilities.

48.     Following that departure, Reid made various public statements characterizing the relationship and Plaintiff's conduct in a manner Plaintiff alleges was false, misleading, and retaliatory.

49.     After the fallout, Reid began making statements—both publicly and through intermediaries—intended to recast Plaintiff's charitable and pastoral support as improper, transactional, or exploitative, despite knowing such characterizations were false.

50.     Shortly after Archbishop Jordan participated in a private White House meeting with African-American faith leaders in May 2025, online commentary directed toward Plaintiff increased dramatically.

51.     Following that meeting, third party content creators and commentators began circulating insinuations and speculative narratives concerning Plaintiff's personal conduct, frequently referencing, republishing, or paraphrasing statements attributed to Defendant Reid or individuals acting in coordination with or at the encouragement of Defendant Reid, including Defendant Edwards.

52.     These narratives established the groundwork for a broader defamatory campaign and were later leveraged to amplify and legitimize false accusations following the unlawful recording and dissemination of Plaintiff's private communications.

**b.     _The Illegal Recording and Interception of Plaintiff's Communications_**

53.     On November 4, 2025, Defendant Edwards initiated multiple telephone communications with Plaintiff who was in New Jersey at the time. Defendant Edwards was physically located in Illinois.

54.     At approximately 3:58 PM on November 4, 2025, Defendant Edwards called Plaintiff. The conversation lasted approximately one hour and two minutes.

55.     During the call, Edwards transmitted to Plaintiff a photograph of himself with Defendant Reid and referenced a "story" allegedly being prepared about Plaintiff while denying any involvement.

56.     The conversation quickly turned confrontational and hostile and Plaintiff communicated that the relationship was ending due to Edwards' conduct and inappropriate language.

57.     Later that evening, at approximately 9:55 PM on November 4, 2025, Defendant Edwards attempted another brief call lasting approximately 18 seconds.

58.     At approximately 9:56 PM on November 4, 2025, Defendant Edwards initiated another call with Plaintiff lasting approximately 45 minutes. This call constitutes the central event giving rise to civil and criminal liability.

59.     During the 9:56 PM call, Defendant Edwards merged Defendant Reid into the call *without* disclosing Reid's presence and *without* obtaining Plaintiff's consent. For the entirety of the call, Plaintiff was unaware that Reid was present or recording the conversation.

60.     Defendant Reid has since admitted that he was located in Dubai, United Arab Emirates, that he was merged into the call by Defendant Edwards without Plaintiff's knowledge or consent, and that he recorded the conversation without Plaintiff's knowledge or consent.

61.     Reid admitted that he recorded Plaintiff's conversation with Edwards. In a public broadcast dated October 15, 2025, prior to the November 4 call, Defendant Reid stated the following:

> "There's someone else that has came to me by night. They were not coming to me to be messing. But because they were lied to, they thought they could come to me about their truth. And the truth of my former mentor. I recorded every conversation and told them. I recorded that every conversation."

62. In Reid's private "members only" broadcasts he has made even more explicit admissions about the existence and use of these recordings and admitted using these recordings to support his public accusations.

    a.   ". . . It's on audio. It's on the audio. Mm-hmm."

    b.   "I can tell my truth about what I was told by Justin. I can tell, I can tell that and he can tell another story or edit story, but the audio verifies what I'm saying."

63.    Defendant Reid's public admission demonstrates that the November 4 recording was not accidental or isolated, but part of a broader pattern and practice of intentionally recording private communications without consent.

64.    Upon information and belief, Defendants Edwards and Reid coordinated the November 4 call and subsequent recording in advance with the intent of capturing Plaintiff's private communications for later use, dissemination, leverage, and monetization.

65.    At all relevant times, Plaintiff had reasonable expectation of privacy in his telephone communications. Defendants knowingly and intentionally violated that exception in violation of federal and state law.

    c.   ***The Independent Illegal Recording by Defendant Blake***

66.    On November 26, 2025, Defendant Blake sent an email to Defendant Reid referencing the recorded communications.

67.    In this email, Blake stated: "I have been helping a friend who he groomed and violated many times all the way until recent as weeks ago . . . The last convo they had was out the blue and I was with my friend and I recorded the entire exchange."

68.    Thereafter, Plaintiff became aware that Defendant Blake recorded a private telephone conversation involving Plaintiff without his knowledge or consent.

69.    On December 6, 2025 ConsciouzTV confirmed the existence of the recording on the Here We Go Again (King Jives) Broadcast "Cause there's a lot of people who got audios, right? Larry got an audio, Bishop Blake got audios" at approximately 02:02:44.

70.    Plaintiff was physically located in New Jersey at the time of this conversation.

71.    Defendant Blake was physically located in Houston, Texas at the time of this conversation.

72.    Plaintiff did not consent either expressly or impliedly to the recording, interception, or preservation of the conversation, and had reasonable and legally protected expectation of privacy in the communications.

73.    Blake's written admission that he "recorded the entire exchange" with Plaintiff demonstrates that the recording was intentional, knowing, and undertaken without Plaintiff's consent.

74.    Thereafter, Defendant Reid forwarded Blake's email and its contents to third parties, including Defendants William McCray and Tyesse Jackson, intentionally distributing information derived from unlawfully recorded private communications beyond the original participants.

75.    Upon information and belief, the recording by Defendant Blake was shared, referenced, or relied upon by Defendants and their associates as part of a broader effort to collect, circulate and exploit Plaintiff's private communications.

d.    ***The Coordinated Defamation Campaign and Conspiracy***

76.    Beginning on or about December 2025, Defendants and their associates released online content referencing purported "emails," "audio," and "private conversations," thereby

12

representing that they possessed and relied upon materials obtained through unlawful interception and recording.

77.     On December 6, 2025, Defendant Augustus, through his "Conscious TV" platform, published a video titled, "Larry Reid Live THE COVER UP! Bishop Bernard Jordan EXPOSED!!! Emails & Audio SHOCKING!"

78.     During the Consciouz TV broadcast, the following defamatory statements were made claiming that Plaintiff was engaged in extramarital affairs, speculating about his sexual orientation, and allegations of tax evasion and stalking and harassment that were not true.

a.     At approximately 01:27:11 - 01:28:22: "Multiple audios exist of Bishop Bernard Jordan exposing his extramarital affairs with a man."
b.     At approximately 01:28:09 - 01:29:09: "We have audio proof of Bishop Jordan's affair with his male lover... the male mistress called the wife."
c.     At approximately 01:31:30 - 01:32:54: Graphic descriptions of sexual acts allegedly performed by Plaintiff, including vulgar references to sexual positions and acts.
d.     At approximately 01:35:02 - 01:36:07: "Bishop owed the IRS $400,000... Bernard is distressed about money... we learned this from the audio."
e.     At approximately 01:45:21 - 01:47:00: "He is gang-stalking the person... calling church members, friends... harassing them... manic, obsessive, weird behavior."

79.     And egregiously, during the broadcast, false statements about Plaintiff's sexual orientation and allegations of molestation attributed to Defendant Singletary were read aloud, including at approximately 02:13:36 - 02:17:00:

a.     "Bishop has been queer his whole time — this goes back 40 years."
b.     "Ask Isaac Jordan — Bernard molested him."
c.     "This was known by ex-ZOE members."
d.     "[His] nephew was molested by his personal assistant."

80.     The accusations of molestation, grooming, and criminal sexual conduct constitute defamation *per se* under applicable law.

81.    The broadcast contained numerous false statements, false implications, and defamatory narratives concerning Plaintiff, including but not limited to accusations of criminal sexual conduct, sexual misconduct, financial impropriety, and abuse of power.

82.    During the broadcast, Defendants and their collaborators made graphic, salacious, and sensationalized statements purporting to describe Plaintiff's private sexual conduct and personal finances, frequently asserting that such claims were supported by "audio" or "recordings."

83.    Defendant James Singletary further made defamatory statements accusing Plaintiff of sexual abuse, grooming and targeting young boys, claiming that Plaintiff's ministry is fraudulent, corrupt, and demonic, and that Plaintiff is bipolar, mentally erratic, or unstable. These claims were presented as fact with no basis and unequivocally false. Such statements by Defendant Singletary constitute defamation *per se*.

84.    Defendant McMillian, through his "Mad Church Disease" platform, published multiple videos discussing Plaintiff in a defamatory manner, including videos dated October 17, 2025, December 1, 2025, and December 2, 2025, which amplified harmful narratives derived from illegally obtained recordings.

85.    Among the most egregious statements aired were allegations that Plaintiff had engaged in grooming, molestation, and criminal sexual abuse; assertions that Plaintiff had concealed such conduct for decades; and claims that Plaintiff engaged in systemic harassment and financial misconduct. These statements were false and were presented as fact.

86.    Plaintiff unequivocally denies all such allegations.

87.    The accusations of molestation, grooming, and criminal sexual conduct constitute defamation *per se* under applicable law.

88.    The defamatory publications were viewed hundreds of thousands of times collectively and caused severe and ongoing harm to Plaintiff's reputation, ministry, professional standing, and emotional well-being.

89.    Defendants Reid, Edwards, Blake, Augustus, McMillian, Jackson, Singletary, Peacock, Bryant, and Does 1–10 acted in concert and conspiracy to:

a.    unlawfully intercept and record Plaintiff's private communications;
b.    share and disseminate such unlawfully obtained recordings and derivative information;
c.    publish false and defamatory statements concerning Plaintiff; and
d.    maximize reputational, professional, and personal harm to Plaintiff for leverage, retaliation, notoriety, and financial gain.

90.    The coordinated nature of Defendants' conduct is evidenced by, among other things:

a.    the timing and sequencing of their publications;
b.    the sharing and referencing of unlawfully obtained recordings and communications among Defendants;
c.    the forwarding of emails and messages explicitly referencing recorded conversations; and
d.    the cross-promotion, repetition, and amplification of defamatory content across multiple platforms.

91.    Defendants knew or recklessly disregarded that their statements were false, that the materials they relied upon were unlawfully obtained, and that their conduct would foreseeably cause catastrophic harm to Plaintiff.

## II.    **Plaintiff's Damages**

92.    The unlawful recording of Plaintiff's private conversations and subsequent dissemination of defamatory statements based on these recordings, viewed hundreds of thousands of times collectively, has caused severe and ongoing harm to Plaintiff's reputation, ministry, professional standing, and emotional well-being.

93. As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain reputational harm.

94. As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain damages related to future professional opportunities in his ministry.

95. As a result of Defendants' actions, Plaintiff has sustained and will continue to sustain damages related to emotional and psychological distress, including anxiety and loss of reputation. Plaintiff has required professional counseling and therapy services to address these injuries and has incurred substantial medical expenses.

96. As a result of Defendants' actions, Plaintiff's ministry experienced significant financial losses, including a reduction in church membership of approximately sixty percent (60%).

97. As a result of the foregoing, Plaintiff seeks relief for the damages caused by Defendant's actions and inactions, all of which will permanently alter the trajectory of Plaintiff's reputation, personal and professional relationships.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Federal Wiretap Act 18 U.S.C. § 2511
### (Against Defendants Reid, Edwards, and Blake)

98. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 97 as if fully set forth herein.

99. The Wiretap Act affords a civil cause of action to an aggrieved individual who has had their oral communications intentionally intercepted by a party to those communications for the purpose of committing a crime or tort. 18 U.S.C. §§ 2520, 2511(1), 2511(2)(d); *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010).

100.    The statute requires that an oral communication be intercepted "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d).

101.    Defendants intentionally intercepted Plaintiff's wire communications for the purpose of circulating damaging and defamatory information about Plaintiff's private life and for the purpose of extorting and monetizing from the recordings in violation of the Federal Wiretap Act 18 U.S.C.S. § 2511.

102.    Unbeknownst to Plaintiff, on November 4, 2025, Defendant Edwards merged Defendant Reid into a telephone call with Plaintiff without disclosing Reid's presence.

103.    Plaintiff, who was located in New Jersey at the time of the conversation, was unaware that Reid was present on the call with Edward, who was located in Chicago, Illinois.

104.    Defendant Reid recorded the entire November 4, 2025, conversation from Dubai.

105.    Plaintiff did not consent to the recording of the November 4, 2025, conversation.

106.    Defendant Reid has publicly admitted to recording the conversation, stating "I recorded every conversation and told them. I recorded that every conversation."

107.    Defendant Blake recorded a separate private telephone conversation with Plaintiff without his knowledge or consent.

108.    Plaintiff was physically located in New Jersey at the time of the conversation with Blake.

109.    Defendant Blake was physically located in Houston, Texas at the time of the conversation.

110.    Plaintiff did not consent either expressly or impliedly to the recording, interception, or preservation of the conversation with Blake.

111.     On November 26, 2025, Defendant Blake sent an email to Defendant Reid stating: "I have been helping a friend who he groomed and violated many times all the way until recent as weeks ago . . . The last convo they had was out the blue and I was with my friend and I recorded the entire exchange."

112.     Blake's written admission demonstrates that the recording was intentional and knowing.

113.     Defendants disclosed the contents of the intercepted communications to third parties.

114.     Defendant Reid forwarded Blake's email and its contents to third parties, including Defendants Jackson and others.

115.     Defendants intentionally used the contents of the intercepted communications in online broadcasts and publications.

116.     Defendants' interception, disclosure, and use of Plaintiff's wire communications violated § 2510.

117.     Defendants utilized the recordings of Plaintiff's wire communications to monetize from false, defamatory, and highly invasive statements concerning Plaintiff's private life including his brief, consensual relationship with Defendant Edwards.

118.     Defendants further used the recordings of Plaintiff's wire communications to amplify Plaintiff's private sexual information across multiple digital platforms, including behind paywalls, for financial gain and notoriety.

119.     This coordinated conduct caused profound reputational destruction, severe emotional distress, and significant professional harm to Plaintiff.

120.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered substantial harm to his reputation, emotional distress, and professional injury.

### COUNT II
### <u>Violation of the Racketeer Influenced and Corrupt Organizations</u>
### <u>(RICO) Act 18 U.S.C. § 1962</u>
### (Against Defendants Reid, Edwards, and Blake)

121.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 120 as if fully set forth herein.

122.    Section 1962(c) of 18 U.S.C. makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

123.    To establish a civil RICO claim for violation of § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that has caused injury to plaintiff's business or property." *Reich v. Lopez*, 38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014), aff'd, 858 F.3d 55 (2d Cir. 2017); *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 520 (2d Cir. 1994).

124.    To demonstrate a pattern of racketeering, a plaintiff must show at least two predicate acts committed in a 10–year period. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) ("*H.J. Inc.* "); *Azrielli*, 21 F.3d at 520.

125.    "A RICO damages plaintiff need allege only that it has suffered an injury directly resulting from some or all of the activities comprising the violation." *Reich*, 38 F. Supp. At 449 ("Therefore, as long as Plaintiff can sufficiently plead proximate injury resulting from the wire fraud conduct, they will have met the injury requirement of RICO standing.")

126. Defendants conducted the affairs of an enterprise through a pattern of racketeering activity.

127. The enterprise consists of a coordinated group of defendants acting in concert to unlawfully intercept, record, disseminate, and monetize from Plaintiff's private communications.

128. Defendants Reid, Edwards, Blake associated together for the common purpose of engaging in a course of conduct that included unlawful interception of communications, wire fraud, and dissemination of unlawfully obtained materials.

129. The enterprise engaged in and affected interstate and foreign commerce through the use of telephone communications across state lines and internationally, and through the dissemination of content via internet platforms accessible nationwide and internationally.

130. Defendants engaged in a pattern of racketeering activity consisting of multiple predicate acts.

131. The predicate acts include violations of  18 U.S.C.S. § 2511 the Wire Tap Act, which constitute predicate acts under  18 U.S.C.S. § 1961.

132. The predicate acts include wire fraud through the use of interstate wire communications to further a defamatory scheme and conspiracy of recording, disseminating, and monetizing private information regarding Plaintiff's private life.

133. On November 4, 2025, Defendants Edwards and Reid used interstate wire communications to unlawfully record Plaintiff's private conversation with Edwards where they discussed their private, consensual relationship.

134. Defendant Reid was located in Dubai, United Arab Emirates during the recording.

135. Defendant Edwards was located in Illinois during the recording.

136. Plaintiff was located in New Jersey during the recording.

137.    Defendants used interstate wire communications to disseminate unlawfully obtained recordings to third parties.

138.    Defendants used internet platforms to publish and monetize content derived from unlawfully obtained recordings.

139.    The pattern of racketeering activity is evidenced by the timing and sequencing of Defendants' publications.

140.    The pattern of racketeering activity is evidenced by the sharing and referencing of unlawfully obtained recordings and communications among Defendants.

141.    The pattern of racketeering activity is evidenced by the forwarding of emails and messages explicitly referencing recorded conversations.

142.    The pattern of racketeering activity is evidenced by the cross-promotion, repetition, and amplification of defamatory content across multiple platforms.

143.    The pattern of racketeering activity is evidenced by the monetization of Plaintiff's private life through subscription-based and paywalled services.

144.    The pattern of racketeering activity is further evidenced by the intentional galvanization of bloggers with anti-Plaintiff agendas and testimony from participants describing the coordinated nature of the attacks.

145.    The evidence establishes a coordinated campaign involving documented financial transactions, sequential deployment of operatives, insider testimony confirming the conspiracy's structure and objectives, and a self-identified "ringleader" whose stated goal was to "end" Plaintiff.

146.    The predicate acts were related to each other and demonstrated continuity.

147.    The predicate acts occurred over a period of months from October 2025 through December 2025 and continued thereafter.

148.    Defendants coordinated to monetize from these communications through paywalls and subscription services.

149.    Plaintiff was injured in his business or property by reason of Defendants' violations.

150.    Plaintiff has suffered substantial reputational harm to his ministerial standing and professional reputation.

151.    Plaintiff has suffered emotional distress as a direct result of Defendants' conduct.

152.    Plaintiff has suffered professional injury and disruption to ministerial relationships, including ministry revenue decline and the loss of church members.

153.    The defamatory publications were viewed hundreds of thousands of times collectively, causing widespread harm to Plaintiff's reputation and ministry.

### COUNT III
### Defamation *Per Se*
### (Against Defendant Davyon Augustus)

154.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 153 as if fully set forth herein.

155.    To state claim for defamation under New York Law, a plaintiff must allege (1) false statement about plaintiff, (2) published to third party without authorization or privilege, (3) through fault amounting to at least negligence on part of publisher, (4) that either constitutes defamation *per se* or caused special damages. *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009); *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001).

156.    A "defamatory" statement is one which "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives

one of confidence and friendly intercourse in society." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177 (2d Cir. 2000).

157.    A plaintiff is not required to plead special harm if he alleges that the defamatory statements (1) accuse him of a serious crime; (2) tend to injure another in his trade, business or profession; or (3) include a claim that plaintiff has a loathsome disease. *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 603 (S.D.N.Y. 2011); *Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).

158.    "[A] public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is made with knowledge that it was false or with reckless disregard of whether it was false or not." *Margolies v. Rudolph*, No. 21-CV-2447-SJB, 2022 WL 2062460, at *3 (E.D.N.Y. June 6, 2022)

159.    On December 6, 2025, Defendant Davyon Augustus, through his online platform "Conscious    TV,"    broadcast    and    published    a    video    titled: "Larry Reid Live THE COVER UP! Bishop Bernard Jordan EXPOSED!!! Emails & Audio SHOCKING!"

160.    During that broadcast, Augustus made the following statements concerning Plaintiff:

      a.  "Multiple audios exist of Bishop Bernard Jordan exposing his extramarital affairs with a man."
      b.  "We have audio proof of Bishop Jordan's affair with his male lover."
      c.  "Bishop owed the IRS $400,000… Bernard is distressed about money… we learned this from the audio."
      d.  "He is gang-stalking the person… calling church members, friends… harassing them… manic, obsessive, weird behavior."

161.    Augustus further published a video containing graphic descriptions of alleged sexual acts purportedly performed by Plaintiff.

162.    These statements were presented as factual assertions, not opinion, satire, or rhetorical hyperbole.

163.    Each of the foregoing statements was false and Plaintiff did not engage in the conduct described in the broadcast.

164.    The statements expressly identified Plaintiff by name and were understood by recipients as referring to Plaintiff.

165.    The broadcast was published through YouTube and related online platforms and was viewed hundreds of thousands of times.

166.    The statements constitute defamation *per se* because they:

    a.  Accused Plaintiff of serious criminal conduct, including sexual misconduct and molestation;

    b.  Imputed sexual misconduct and immoral behavior incompatible with his role as a minister; and

    c.  Tended to injure Plaintiff in his trade, profession, and ministerial calling.

167.    The statements were not substantially true in any respect.

168.    Plaintiff is a nationally recognized minister and public figure.

169.    Defendant Augustus acted with actual malice.

170.    Augustus possessed recordings of Plaintiff's private conversations and disseminated them with the intent to construct and publish a false narrative concerning Plaintiff's sexual orientation, alleged criminal conduct, and financial improprieties.

171.    Augustus knew the statements were false or acted with reckless disregard for their truth or falsity.

172.    Augustus relied on unlawfully obtained recordings and deliberately ignored contrary evidence demonstrating the falsity of his accusations.

173.    Augustus intended the publication to cause reputational, professional, and financial harm to Plaintiff.

174.    As a direct and proximate result of Augustus's defamatory publications:

    a.  Plaintiff suffered substantial reputational harm;
    b.  Plaintiff's ministry experienced significant financial losses, including a reduction in church membership of approximately sixty percent (60%);
    c.  Plaintiff suffered harm to his ministerial standing and professional relationships; and
    d.  Plaintiff suffered severe emotional distress.

### COUNT IV
### Defamation *Per Se*
### (Against Defendant James Singletary)

175.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 174 as if fully set forth herein.

176.    On December 6, 2025, during the same broadcast described above, Defendant James Singletary appeared as a guest and made the following statements concerning Plaintiff:

    a.  "Bishop has been queer his whole time this goes back 40 years."
    b.  "Ask Isaac Jordan Bernard molested him."

177.    These statements were presented as factual assertions.

178.    Each statement was false and Plaintiff did not engage in the conduct described.

179.    The statements expressly identified Plaintiff by name and were understood by recipients as referring to Plaintiff.

180.    The statements were broadcast through YouTube and other online platforms and viewed by hundreds of thousands of recipients.

181.    The statements constitute defamation *per se* because they:

    a.  Accused Plaintiff of serious criminal conduct, including molestation and sexual abuse;
    b.  Imputed sexual misconduct incompatible with his ministry; and
    c.  Injured Plaintiff in his trade and profession.

182.    These statements were unequivocally false.

183.    Plaintiff is a nationally recognized minister and public figure.

184.    Singletary acted with actual malice.

185.    Singletary knew the statements were false or acted with reckless disregard for their truth or falsity.

186.    Singletary made the accusations without any factual basis and with awareness of their probable falsity.

187.    As a direct and proximate result of Singletary's defamatory statements, Plaintiff suffered the reputational, professional, financial, and emotional harms described above.

## COUNT V
### Defamation *Per Se*
### (Against Defendant Marcellus McMillian)

188.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 187 as if fully set forth herein.

189.    On October 17, 2025, December 1, 2025, and December 2, 2025, Defendant Marcellus McMillian published videos concerning Plaintiff through online platforms, including YouTube and related media channels.

190.    In those videos, McMillian made statements including, but not limited to, the following:

    a.    That Plaintiff engaged in sexual misconduct with men;
    b.    That Plaintiff engaged in criminal sexual conduct, including molestation or abuse;
    c.    That Plaintiff's ministry was fraudulent, corrupt, or deceptive;
    d.    That Plaintiff engaged in unethical or criminal financial practices;
    e.    That Plaintiff was mentally unstable, bipolar, erratic, or dangerous.

191.    These statements were presented as assertions of fact, not opinion, rhetorical hyperbole, or commentary.

26

192.    Each of the foregoing statements was false and Plaintiff denies engaging in the conduct described.

193.    The statements expressly identified Plaintiff by name and were understood by recipients as referring to Plaintiff.

194.    The videos were published to third parties via online platforms and were viewed by a substantial audience.

195.    The statements constitute defamation *per se* because they:

   a.  Accused Plaintiff of serious criminal conduct, including sexual abuse and molestation;
   b.  Imputed sexual misconduct incompatible with his ministerial position;
   c.  Imputed professional misconduct and fraud in his ministry; and
   d.  Tended to injure Plaintiff in his trade, profession, and ministerial calling.

196.    The statements were not substantially true in any respect.

197.    Plaintiff is a nationally recognized minister and public figure.

198.    McMillian acted with actual malice.

199.    McMillian knew the statements were false or acted with reckless disregard for their truth or falsity.

200.    McMillian repeated and amplified allegations that lacked factual basis and ignored obvious reasons to doubt their accuracy.

201.    McMillian intended to harm Plaintiff's reputation and professional standing by publishing and republishing such accusations.

202.    As a direct and proximate result of McMillian's defamatory publications, Plaintiff suffered reputational harm, professional injury, financial losses to his ministry, and severe emotional distress.

## COUNT VI
## Defamation *Per Se*
### (Against Defendants Larry D. Reid and Justin D. Edwards –
### Dissemination of Private Telephone Recordings)

203.    Plaintiff repeats and realleges paragraphs 1–203 as if fully set forth herein.

204.    Defendants Reid and Edwards disseminated recordings of Edwards' private phone conversations with Plaintiff to third parties.

205.    The recordings were disseminated in a manner that conveyed and implied that Plaintiff:

    a.  Engaged in extramarital sexual relationships with men;
    b.  Engaged in criminal sexual misconduct;
    c.  Engaged in fraudulent or unethical conduct in his ministry; and
    d.  Engaged in improper financial conduct.

206.    The dissemination of the recordings was accompanied by commentary and framing that asserted the truth of these accusations.

207.    The implications and assertions conveyed through the dissemination were false.

208.    Plaintiff did not engage in the conduct suggested or implied.

209.    The recordings expressly identified Plaintiff and were understood by recipients as referring to Plaintiff.

210.    Reid and Edwards distributed the recordings to third parties without Plaintiff's authorization or privilege.

211.    The recordings were further republished and broadcast through online platforms to a substantial audience.

212.    The dissemination constituted defamation *per se* because it imputed serious criminal conduct, sexual misconduct incompatible with Plaintiff's ministry, and professional fraud.

213.    The implications conveyed were unequivocally false.

214.    Plaintiff is a nationally recognized minister and a public figure.

215.    Reid and Edwards acted with actual malice because they knew or should have known the information was unlawfully obtained and acted with knowledge of falsity to damage Plaintiff's reputation.

216.    They recorded Plaintiff's private conversations and disseminated them with the intent to construct and promote a false narrative concerning Plaintiff's sexual orientation, alleged criminal conduct, and financial improprieties.

217.    They knew that the narrative being promoted was false or acted with reckless disregard for its truth or falsity.

218.    They intended that the recordings be used to damage Plaintiff's reputation and professional standing.

219.    As a direct and proximate result of the dissemination of the recordings, Plaintiff suffered reputational injury, professional harm, financial losses to his ministry, and severe emotional distress.

**COUNT VII**
**Civil Conspiracy**
**(Against Defendants Larry D. Reid, Justin D. Edwards, Calvin R. Blake Sr.)**

220.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 219 as if fully set forth herein.

221.    To establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006).

222.    Defendants Reid, Edwards, and Blake entered into an agreement to accomplish an unlawful purpose.

223.    Defendants Reid and Edwards agreed to unlawfully intercept and record Plaintiff's private communications.

224.    Reid and Edwards agreed to share and disseminate such unlawfully obtained recordings and derivative information with third parties who utilized the recordings as part of YouTube broadcasts.

225.    Reid and Edwards agreed to publish false and defamatory statements concerning Plaintiff.

226.    Defendants agreed to maximize reputational, professional, and personal harm to Plaintiff for leverage, retaliation, notoriety, and financial gain.

227.    Defendants committed overt acts in furtherance of the conspiracy.

228.    On November 4, 2025, Defendants Edwards and Reid coordinated to merge Reid into a telephone call with Plaintiff and record the conversation without Plaintiff's consent.

229.    Defendant Blake recorded a separate conversation with Plaintiff without consent.

230.    On November 26, 2025, Defendant Blake sent an email to Defendant Reid referencing the recorded communications.

231.    Defendant Reid forwarded Blake's email to third parties, including Defendants Jackson and others.

232.    On December 6, 2025, Defendant Augustus published a video containing false and defamatory statements about Plaintiff.

233.    Defendant McMillian published multiple videos amplifying harmful narratives derived from illegally obtained recordings.

234.    The coordinated nature of Defendants' conduct is evidenced by the timing and sequencing of their publications.

235.    The coordinated nature of Defendants' conduct is evidenced by the sharing and referencing of unlawfully obtained recordings and communications among Defendants.

236.    The coordinated nature of Defendants' conduct is evidenced by the forwarding of emails and messages explicitly referring to the recorded conversations.

237.    The coordinated nature of Defendants' conduct is evidenced by the cross-promotion, repetition, and amplification of defamatory content across multiple platforms.

238.    Plaintiff suffered injury or damage resulting from the conspiracy.

239.    As a direct and proximate result of the conspiracy, Plaintiff has suffered substantial injury to his reputation, ministerial standing, and emotional well-being.

240.    Plaintiff has suffered professional injury and disruption to ministerial relationships.

241.    The defamatory publications were viewed hundreds of thousands of times collectively, causing widespread harm  to Plaintiff's reputation and church membership.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants Larry D. Reid, Justin D. Edwards, Calvin R. Blake Sr.)**

242.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 242 as if fully set forth herein.

243.    In cause of action for intentional infliction of emotional distress (IIED), under New York law, a plaintiff must plead and prove four elements: (1) extreme and outrageous conduct, (2) intentional or reckless nature of such conduct, (3) causal relationship between conduct and resulting injury, and (4) severe emotional distress. *Routh v. Univ. of Rochester*, 981 F. Supp. 2d

184, 214 (W.D.N.Y. 2013); *Mitchell v. Giambruno*, 35 A.D.3d 1040, 1041, 826 N.Y.S.2d 788, 789 (3rd Dept. 2006).

*244.*    Defamatory statements or false accusations of criminal conduct without anything more are generally not sufficiently extreme and outrageous to support an IIED claim under New York law. *Id.; see also Rivers v. Towers, Perrin, Forster & Crosby, Inc.*, Civil Action No. CV–07–5441 (DGT)(RML), 2009 WL 817852 at *8 (E.D.N.Y. Mar. 27, 2009) (Employer falsely informing police that Plaintiff had stolen laptop computers was not sufficiently outrageous to support an IIED claim).

245.    Defendants engaged in extreme and outrageous conduct by engaging in a coordinated attempt to defame and damage Plaintiff's personal and professional ministerial relationships.

246.    Defendants engaged in a coordinated campaign of unlawful surveillance, nonconsensual recording, and intentional dissemination of phone recordings of Plaintiff.

247.    Defendants published and monetized false, defamatory, and highly invasive statements concerning Plaintiff's private life.

248.    Defendants unlawfully recorded Plaintiff's private telephone communications without consent.

249.    Defendants disseminated unlawfully obtained recordings to third parties.

250.    Defendants published false accusations of criminal sexual conduct, molestation, grooming, and financial impropriety.

251.    Defendants published graphic descriptions of alleged sexual acts.

252.    Defendants published accusations of mental instability and erratic behavior.

253.    Defendants monetized Plaintiff's private information through subscription-based and paywalled services.

254.    This conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in civilized society.

255.    Defendants' defamatory campaign against Plaintiff was deliberate and malicious as Defendants Reid and Edwards coordinated to record Plaintiff's communications regarding his private life to damage his reputation and his personal and professional relationships.

256.    Defendants' conduct was intentional and malicious as they repeatedly expressed their motivation to hurt Plaintiff's reputation and ministry and even threatening to "make his wife cry."

257.    Defendants intended to cause severe emotional distress or acted with reckless disregard for the likelihood of causing severe emotional distress.

258.    Defendants undertook this conduct with knowledge of Plaintiff's identity, vocation, and the severe and foreseeable harm such disclosures would inflict upon his reputation and ministry.

259.    The conduct was designed to retaliate against Plaintiff, extract financial benefit, and damage Plaintiff's reputation.

260.    Defendants intentionally targeted Plaintiff intending to cause harm to his reputation, professional relationships, family, and extort money from Plaintiff.

261.    There is a causal connection between Defendants' conduct and Plaintiff's injury.

262.    Plaintiff's emotional distress was directly caused by Defendants' unlawful and outrageous conduct.

263.    Plaintiff suffered severe emotional distress.

264.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress, including anxiety, depression, and disruption to his personal and professional life.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Archbishop E. Bernard Jordan respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

(i) On the first cause of action for violation of the Federal Wiretap Act 18 U.S.C. § 2511 a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(ii) On the second cause of action for violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act 18 U.S.C. § 1962 a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(iii) On the third cause of action for defamation *per se* a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss

of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(iv) On the fourth cause of action for defamation *per se* a against Defendant James Singletary a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(v)  On the fifth cause of action for defamation *per se* against Defendant Marcellus McMillian a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(vi)  On the sixth cause of action for defamation *per se* against Defendants Larry D. Reid and Justin D. Edwards a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(iv) On the seventh cause of action for civil conspiracy a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss

of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

(v) On the eighth cause of action for Intentional Infliction of Emotional Distress a judgment awarding Plaintiff damages in an amount to be determined at trial but in any event no less than $10,000,000, including without limitation, damages to reputation, loss of professional opportunities, loss of ministry revenue and future revenue, emotional and psychological damages, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial before a jury on all issues so triable.

**Dated: February 10, 2026**
**New York, New York**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

By: /s/ *Andrew T. Miltenberg*
**Andrew T. Miltenberg, Esq.**

**363 Seventh Avenue, 5th Floor**
**New York, New York 10001**
**Telephone: (212) 736-4500**
**amiltenberg@nmllplaw.com**